### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF KENTUCKY
### LEXINGTON DIVISION

**STANFORD WEST**
324 Spring Valley Lane
Lexington, KY 40511

and

**JAMES D. LYON AS CHAPTER 7 TRUSTEE FOR THE ESTATE OF MELISSA MONDAY-WEST**
209 E. High Street
Lexington, KY 40507

      Plaintiffs

v.

**WELLS FARGO BANK, N.A.**
℅ Corporation Service Company,
Registered Agent
421 W. Main Street
Frankfort, KY 40601

      Defendant

**Case No.**

**Filed Electronically**

**<u>COMPLAINT FOR MONEY</u>**
**(Jury Trial Demanded)**

\* \* \* \* \*

Plaintiffs James D. Lyon as Chapter 7 Trustee for the Estate of Melissa Monday-West ("Melissa West") and Stanford West (collectively "Plaintiffs"), for their Complaint against Defendant Wells Fargo Bank, N.A., state as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Stanford West ("Mr. West") resides in the City of Lexington, County of Fayette, Commonwealth of Kentucky. Mr. West was the owner of the real property located at 4157 Watertrace Drive, Lexington, Kentucky 40515, which is the subject of this Complaint. (the "Property")

2.    Plaintiff James D. Lyon as Trustee for the Estate of Melissa Monday-West is a natural person. James D. Lyon was the duly appointed Chapter 7 Trustee in United States Bankruptcy Court Case No. 13-52335 in the United States Bankruptcy Court for the Eastern District of Kentucky for Melissa Monday-West. Any claims alleged herein on behalf of Melissa West are property of her Bankruptcy Estate for which James D. Lyon is the Chapter 7 Trustee. Mrs. West was the co-owner of the Property.

3.    Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a national bank incorporated under the laws of the State of Delaware that maintains its principal places of business in Sioux Falls, SD and San Francisco, CA. Wells Fargo was the servicer of a Note executed by Mr. West and of a Mortgage on the Property that secured said note on the Property (collectively, "the Loan").

4.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) as the matter in controversy as more fully detailed throughout the Complaint exceeds $75,000.00 exclusive of damages sought of a punitive nature and/or interest and costs, and is between citizens of different States.

5.    This Court has supplemental jurisdiction to hear all state law statutory and common law claims pursuant to 28 U.S.C. § 1367.

6.    Venue lies in this District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL BACKGROUND

**a.    Wells Fargo fails to adequately test its automated decision-making tool over a period of at least 8 years.**

7.    The Home Affordable Modification Program (HAMP) was designed to provide the very help that Plaintiff needed. Introduced pursuant to the Emergency Economic

Stabilization Act of 2008, HAMP required mortgage servicers to offer loan modifications to borrowers who met certain threshold requirements. These modifications would lower a borrower's mortgage payments to a manageable level (typically 31 percent of the borrower's monthly income) and allow the borrower to avoid foreclosure.

8.      Similar threshold requirements were incorporated into the mortgage modification requirements of government-sponsored enterprises (or GSEs), such as Fannie Mae and Freddie Mac, and the Federal Housing Administration (FHA).

9.      Mr. and Mrs. West met the threshold requirements for a modification of their mortgage loan and the servicer of their loan, Wells Fargo, was required to offer them a loan modification. Wells Fargo failed to do so, however, and instead foreclosed on Mr. and Mrs. West who could not make her monthly payments without a modification.

10.     Wells Fargo's problem goes much deeper than a single miscalculation, however, and reflects the same type of extreme and outrageous conduct that has embroiled Wells Fargo in a string of public scandals.

11.     Between 2010 and 2018, Wells Fargo failed to detect multiple systematic errors in its automated decision-making tool. This software determined customers' eligibility for a government-mandated mortgage modification during a time of extreme financial distress. Its importance to these customers' lives cannot be overstated. Yet Wells Fargo not only failed to verify that its software was correctly calculating whether customers met threshold requirements for a mortgage modification, it failed to regularly and properly audit the software for compliance with government requirements—allowing life-changing errors to remain uncorrected for years on end.

12.     Wells Fargo was not required to develop its own tool to calculate whether its customers were eligible for government-mandated mortgage modifications. The government provided a free software tool for mortgage servicers to use in determining whether homeowners met threshold requirements. If Wells Fargo was not going to properly verify and audit its own software, it could have—and should have—used the free software instead.

13.     As a result of Wells Fargo's deficient auditing and compliance procedures, the Bank repeatedly violated HAMP and other government requirements over a period of at least eight years and denied the Wests' a modification that the Bank was legally required to offer.

14.     Wells Fargo failed to use appropriate auditing and compliance procedures even after a 2010 investigation by the Office of Comptroller of the Currency (OCC) found numerous deficiencies in the Bank's mortgage modification and foreclosure practices.

15.     The OCC found, among other things, that the Bank had failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures.

16.     Wells Fargo agreed to correct these deficiencies in two 2011 consent orders, one of which was signed by the Bank's Board of Directors (all of whom were also officers and/or directors of Wells Fargo & Company), and the other of which was signed by WFC pursuant to a resolution passed by WFC's Board of Directors.

17.     Wells Fargo pledged in the 2011 consent orders to maintain adequate governance and controls to ensure compliance with HAMP; to engage in ongoing testing for compliance with HAMP; and to ensure that the Bank's mortgage modification and foreclosure practices were regularly reviewed and any deficiencies promptly detected and remedied. The Bank also

promised to maintain a Compliance Committee of board members to monitor its ongoing compliance with the Consent Order.

18.    In one of the consent orders, the Federal Reserve specifically ordered the WFC's Board of Directors to take steps to ensure the Bank complied with its obligations under the consent orders, including by strengthening the Board's oversight of compliance with HAMP and other government requirements; to ensure that audit and compliance programs were adequately staffed; and to improve the information and reports that would be regularly reviewed by WFC's Board of Directors.

19.    Wells Fargo subsequently reported to the Federal Reserve that the Bank's Compliance Committee was meeting as required, that the Audit & Examination Committee of WFC's Board of Directors would also assume ongoing responsibility for oversight and compliance based on improved reporting, and that WFC's Chief Operational Risk Officer (CORO) was providing both the Compliance Committee and the Audit & Examination Committee with the necessary information and testing results for them to effectively oversee the Bank's mortgage modification and foreclosure practices and ensure compliance with HAMP and other government requirements.

20.    Together, Wells Fargo's executives and board members—in particular, Wells Fargo's Compliance Committee, Chief Operational Risk Officer, and Audit & Examination Committee—were supposed to make sure that the Bank conducted the necessary testing to detect and remedy any violations of HAMP and other government requirements. They repeatedly failed to fulfill these obligations over the course of several years, however—in violation of the promises they made in the 2011 Consent Order and in callous disregard of the well-being of their customers.

21.     Four years after Wells Fargo agreed to the terms of the 2011 consent orders, in June 2015, the OCC found that the Bank was still in continuing noncompliance. Among other things, the OCC found that Wells Fargo had not maintained ongoing testing for compliance with HAMP and other government requirements; had not ensured that the Bank's audit and compliance programs had the requisite authority and status within Wells Fargo so that deficiencies in the Bank's mortgage modification and foreclosure practices would be identified and promptly remedied; and had not ensured that the Bank was making reasonable good faith efforts, consistent with HAMP and other government requirements, to modify delinquent mortgage loans and prevent foreclosures of its customers' homes.

22.     In response to Wells Fargo's ongoing violations of the 2011 Consent Order, the OCC prohibited the Bank from growing its residential mortgage servicing business until Wells Fargo brought its operations into compliance with an amended consent order. The OCC also stated that it would be taking additional action against Wells Fargo, the nature and severity of which would depend on the nature, length, and severity of the Bank's continued noncompliance with the amended consent order.

23.     As a result of Wells Fargo's continuing failure to implement adequate auditing and compliance procedures, Wells Fargo failed to catch an error in its mortgage modification software that led the Bank to wrongly deny mortgage modifications to 184 customers between March 2013 and October 2014. The OCC specifically noted this error in its May 24, 2016 order requiring Wells Fargo to pay a civil money penalty of $70 million.

24.     Unbeknownst to the OCC, Wells Fargo had discovered another error in its mortgage modification software in October 2015—one of the errors at issue in this case—which caused the Bank to wrongly deny mortgage modifications to 625 customers. Well Fargo decided

not to tell anybody it had discovered this error—likely as part of an effort to avoid a larger penalty from the OCC and ensure that the OCC would terminate its supervision of the Bank under the 2011 Consent Order and lift the business restrictions it had imposed in 2015.

25.     The Bank's seven-member Board of Directors signed the stipulation under which the Bank accepted the $70 million penalty and acknowledged the error that led the Bank to wrongly deny mortgage modifications to 184 customers in 2013-2014. These directors did not disclose that the Bank had discovered another error—either because their oversight was so non-existent that they did not know, or because they chose to deliberately mislead the OCC to minimize the Bank's penalty and ensure that the OCC lifted the business restrictions it had imposed on the Bank.

26.     To make matters worse, even after discovering the 2015 error, Wells Fargo still did not reform its auditing and verification practices. Related errors that would affect an additional 145 customers were not discovered until three years later.

27.     The failure of Wells Fargo's executives and board members to implement adequate auditing and compliance procedures was not an accident. As scandal after scandal comes to light, it has become all too clear that Wells Fargo's leaders intentionally abandoned their oversight responsibilities—and did so to a shocking degree.

28.     Just as it did in the 2011 Consent Order, Wells Fargo often promised to reform its central oversight as part of its settlements with the government. Each time, Wells Fargo's Board and executives failed to live up to those promises and continued to abdicate their oversight responsibilities. As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's

size, complexity and risk profile," which has "caused the Bank to engage in reckless unsafe or unsound practices and violations of law.

29.    Wells Fargo's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced that it would prohibit Wells Fargo from expanding its business until it sufficiently improves its governance and controls.

30.    In its Cease and Desist Order to Wells Fargo, the Federal Reserve Board found that Wells Fargo had pursued a business strategy that emphasized sales and growth without ensuring that senior management had maintained an adequate risk management framework, which resulted in weak compliance practices.

31.    Wells Fargo was ordered to submit a plan for reforming Board oversight and governance, including steps that it will take to hold senior management accountable, maintain a management structure that promotes effective oversight and compliance control, and ensure the comprehensive reporting necessary for the Board to oversee the firm's execution of its compliance control program.

32.    Wells Fargo was also ordered to submit a plan for reforming its firm-wide compliance program, which must include effective testing and validation measures for compliance with applicable laws.

33.    Until Wells Fargo's plans for reform are approved by the Federal Reserve and the implementation of those reforms pass independent review by a third-party auditor, Wells Fargo is subject to an asset cap that restricts the company from growing larger. 63. As one banking expert told the New York Times, Wells Fargo "is lucky it is too big to shut down." "A smaller bank might have lost its banking licenses."

34.    A few months after the Federal Reserve's 2018 Cease and Desist Order, and facing the prospect of review by a third-party auditor, Wells Fargo finally disclosed the 2015 error—first to its shareholders in its Q2 2018 Form 10-Q and then to the customers who were denied mortgage modifications, many of whom lost their homes as a result of the error. Wells Fargo wrote in its 10-Q that approximately 625 customers were incorrectly denied a loan modification between April 12, 2010, and October 20, 2015 (when the error was corrected), and that approximately 400 of those instances resulted in a foreclosure. Wells Fargo also wrote that it had "accrued $8 million to remediate customers," which amounts to an average of only $12,800 per customer.

35.    Three months later, in its next Form 10-Q, Wells Fargo disclosed that it had discovered related errors that affected approximately 245 more customers who were incorrectly denied a mortgage modification between March 15, 2010, and April 30, 2018, when Wells Fargo says that "new controls were implemented." These related errors raised the number of affected customers to approximately 870 and the resulting wrongful foreclosures to approximately 545.

36.    Wells Fargo's long-overdue review of its automated mortgage modification software is apparently still not complete. In its recently filed 10-K Annual Report, Wells Fargo disclosed to shareholders that the "effort to identify other instances in which customers may have experienced harm is ongoing, and it is possible that we may identify other areas of potential concern."

37.    To compound matters during his testimony on March 12, 2019 in the United States House of Representatives Financial Services Committee, Timothy Sloan had the following exchange with Rep. Joyce Beatty:

> In your 10-Q filing from August 2018, your company stated that "an internal review of the Company's use of a mortgage loan modification underwriting tool

identified a calculation error that affected certain accounts that were in the foreclosure process between April 13, 2010 and October 20, 2015 when the error was corrected. Additionally the filing stated, "as a result of this error, approximately 625 customers were incorrectly denied a loan modification...in approximately 400 of these instances, after the loan modification was denied or the customer was deemed ineligible to be offered loan modification, a foreclosure was complete." Wells Fargo later updated those numbers to 870 customers who were incorrectly denied a loan and your company had improperly foreclosed on 545 of these customers.

What explains the gap between identifying the error in October 2015 and disclosing the error nearly 3 years later in August of 2018?

***Response of Timothy Sloan:*** Wells Fargo did not disclose the calculation error in the Home Preservation Application ("HPA") tool in October 2015 because a review of a sample of accounts at that time showed the error had not harmed customers. In 2018, while reviewing an unrelated issue, Wells Fargo re-reviewed the HPA tool error and determined that, in fact, it had impacted loan modification decisions between April 2010 and October 2015. Wells Fargo then disclosed this information in its second quarter 10-Q filing in August 2018.

### b.    <u>The Wests' experience with the software glitch.</u>

38.    In late 2011 the Wests began experiencing financial difficulties stemming from economic strains caused by the recession and, like millions of other Americans during that time frame, defaulted on their mortgage loan.

39.    The Wests had two mortgage loans. The first, held directly by the Federal National Mortgage Association ("Fannie Mae"), was serviced by Wells Fargo. The second, a home equity line of credit, was held and serviced by Wells Fargo.

40.    Just prior to December 28, 2011 the Wests contacted Wells Fargo regarding their financial difficulties and applied for a loan modification. ("Mod 1")  This application resulted in Wells Fargo offering a Home Affordable Unemployment Program Modification which required the Wests to tender six (6) payments of $549.18 principal and interest with the payments due on March 1, 2012; April 1, 2012; May 1, 2012; June 1, 2012; July 1, 2012 and August 1, 2012.

41.     Wells Fargo based the payments on 31% of Melissa West's gross unemployment income of $1,798.33 monthly as Mr. West at that time had no income.

42.     The end result of the Home Affordable Unemployment Program Modification was that on October 2, 2012 after submitting all documentation for a Making Homes Affordable (HAMP) Modification with Wells Fargo as requested, Wells Fargo denied the Wests' initial application for modification on October 2, 2012. A copy of Wells Fargo's October 2, 2012 denial letter is attached as Exhibit 1 to this Complaint. [1]

43.     After being notified of the denial on October 3, 2012 the Wests began the process of submitting a second application for loss mitigation. ("Mod 2") At that time the Wests income was identical to the income from the December 28, 2011 submission as Mrs. West was still receiving unemployment of $1,798.00 Monthly.

44.     The application for Mod 2 was not considered facially complete until November 30, 2012.

45.     On November 7, 2012, Wells Fargo filed a foreclosure action in the Commonwealth of Kentucky Fayette Circuit Court, Case No. 12-CI-04950 (the "Foreclosure Case"). A docket from Foreclosure Case is attached as Exhibit 2.

46.     The Wests' second application was denied by Wells Fargo on February 12, 2013 because they allegedly did not have sufficient income to afford a modified loan payment. A copy of Wells Fargo's February 12, 2013 denial letter is attached as Exhibit 3. [2]

---

[1] **Pursuant to the Protective Order attached as Exhibit 15 to this Complaint entered between Wells Fargo and the Plaintiffs in previous litigation, Plaintiffs are not attaching Exhibits 1, 3, 4, 5, 6, and 10 to this Complaint.  Plaintiffs will be filing a Motion for Leave to File Exhibits 1, 3, 4, 5, 6, and 10 Under Seal pursuant to LR 5.7. The filing of Exhibits 1, 3, 4, 5, 6 and 10 shall be governed by this Court's Order on the Motion for Leave to File Exhibits 1, 3, 4, 5, 6, and 10 Under Seal.**
[2] **Exhibit 3 is not attached to the Complaint is subject to the Protective Order attached as Exhibit 15 and the Motion for Leave to File Exhibits under Seal.**

47.     Wells Fargo's decision to deny the Wests' request for a loan modification was due to a computer glitch which improperly denied the Wests' application not for the reason specified in Exhibit 3 but because the glitch indicated the Wests principal balance would increase causing the 31% income-to-payment ratio to be unaffordable. This is supported by Wells Fargo's own servicing file notes which denote "Reason Code 63 Denial" input by User Id. OUQ on February 12, 2013. A copy of Wells Fargo's Servicing Record, Bates Stamped "CONFIDENTIAL WF_West_00000278" is attached as Exhibit 4.[3]

48.     This decision is also supported by Wells Fargo's own servicing file notes which denote the HPA tool, which is the purported source of the glitch based on Wells Fargo's own statements and disclosures, was used prior to December 16, 2012 and generated the miscalculated increased principal balance. A copy of Wells Fargo's Servicing Record, Bates Stamped "CONFIDENTIAL WF_WEST_00000284" is attached as Exhibit 5. [4]

49.     Unfortunately for the Wests, Wells Fargo had made the decision on December 13, 2012 not to communicate this decision to the borrowers. See Exhibit 6, Wells Fargo's Servicing Record Bates Stamped "CONFIDENTIAL_WF_WEST_00000285". [5]

50.     At the time of the denial on December 13, 2012 and also when the Wests received the February 12, 2013 rejection letter, the Wests owed Wells Fargo the Unpaid Principal Balance amount of $138,067.80. *Id.*

51.     Having exhausted their options with Wells Fargo, the Wests filed a Chapter 13 bankruptcy petition in the United States District Court for the Eastern District of Kentucky, Case

---

[3] **Exhibit 4 is not attached to the Complaint is subject to the Protective Order attached as Exhibit 15 and the Motion for Leave to File Exhibits under Seal.**
[4] **Exhibit 5 is not attached to the Complaint is subject to the Protective Order attached as Exhibit 15 and the Motion for Leave to File Exhibits under Seal.**
[5] **Exhibit 6 is not attached to the Complaint is subject to the Protective Order attached as Exhibit 15 and the Motion for Leave to File Exhibits under Seal.**

No. 13-51022 on April 19, 2013. A copy of the bankruptcy docket for Case No. 13-51022 is attached as Exhibit 7.

52.     Fannie Mae objected to confirmation of Ms. West's proposed plan of reorganization because of the plan's treatment of pre-petition mortgage loan arrearages. A copy of Fannie Mae's objection is attached as Exhibit 8.

53.     The Wests' prepetition mortgage loan arrearages would have been capitalized into a new modified loan but for Wells Fargo's error.

54.     Stress caused by the foreclosure and the threat of losing their home ultimately led to the Wests' separation. To this day the Wests' remain legally separated however they are co-habitating and raising their son.

55.     Because the Wests were unable to resolve their prepetition mortgage loan arrearages, their reorganization failed. Melissa West made the decision to file a Motion to Split (Bifurcate) her Petition for Relief on September 4, 2013 and her case was converted to Chapter 7, Case No. 15-52335 on September 30, 2013. A copy of the docket sheet for Case No. 15-52335 is attached as Exhibit 9.

56.     Melissa West's Chapter 7 case discharged on January 6, 2014.  Mr. West's Chapter 13 Case was dismissed on October 21, 2013.

57.     The Fayette Circuit Court entered a foreclosure Judgment and Order of Sale on May 30, 2014.

58.     A foreclosure sale of the Wests' home was conducted and a report of sale was filed on July 1, 2014 and the Order Distributing Proceeds was entered on September 9, 2014.

59.    The property sold for $208,773.75. See Exhibit 10 – Confidential WF_West_00000621[6]. Of the $208,773.75, Wells Fargo received $174,046.97. *Id.* [7]

**c.    Wells Fargo's 2018 Admission and Apology to the Wests.**

60.    On or about August 3, 2018, Wells Fargo filed a Form 10-Q with the United States Securities and Exchange Commission. The August 3, 2018 Form 10-Q is attached as Exhibit 11.

61.    The Form 10-Q identified a:

> [C]alculation error that affected certain accounts that were in the foreclosure process between April 13, 2010, and October 20, 2015, when the error was corrected … [a]s a result of this error, approximately 625 customers were incorrectly denied a loan modification or were not otherwise offered a modification in cases where they would have otherwise qualified. In approximately 400 of these instances … a foreclosure was completed.

*Id.*

62.    The August 3, 2018 10-Q has since been amended by Wells Fargo in three subsequent 10-Q filings including the filing in April 2019 which now states:

> **Mortgage Loan Modifications** An internal review of the Company's use of a mortgage loan modification underwriting tool identified a calculation error regarding foreclosure attorneys' fees affecting certain accounts that were in the foreclosure process between April 13, 2010, and October 2, 2015, when the error was corrected. A subsequent expanded review identified related errors regarding the maximum allowable foreclosure attorneys' fees permitted for certain accounts that were in the foreclosure process between March 15, 2010, and April 30, 2018, when new controls were implemented. Similar to the initial calculation error, these errors caused an overstatement of the attorneys' fees that were included for purposes of determining whether a customer qualified for a mortgage loan modification or repayment plan pursuant to the requirements of government-sponsored enterprises (such as Fannie Mae and Freddie Mac), the Federal Housing Administration (FHA), and the U.S. Department of Treasury's Home

---

[6] **Exhibit 10 is not attached to the Complaint is subject to the Protective Order attached as Exhibit 15 and the Motion for Leave to File Exhibits under Seal.**
[7] **Exhibit 10 is not attached to the Complaint is subject to the Protective Order attached as Exhibit 15 and the Motion for Leave to File Exhibits under Seal.**

Affordable Modification Program. Customers were not actually charged the incorrect attorneys' fees. As previously disclosed, the Company has identified customers who, as a result of these errors, were incorrectly denied a loan modification or were not offered a loan modification or repayment plan in cases where they otherwise would have qualified, as well as instances where a foreclosure was completed after the loan modification was denied or the customer was deemed ineligible to be offered a loan modification or repayment plan. The number of previously disclosed customers affected by these errors may change as a result of ongoing validation, but is not expected to change materially upon completion of this validation. The Company has contacted substantially all of the identified customers affected by these errors and has provided remediation as well as the option to pursue no-cost mediation with an independent mediator. The Company's review of its mortgage loan modification practices is ongoing, and we are providing remediation to the extent we identify additional affected customers as a result of this review.

See Exhibit 12 – April 2019 Form 10-Q

63.     On or about September 11, 2018, Wells Fargo sent correspondence to the Wests (the "Wells Fargo Letter") with the subject: "We made a mistake when we reviewed you for payment assistance." The Wells Fargo Letter is attached as Exhibit 13.

64.     The Wells Fargo Letter admits that "Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A."

65.     The Wells Fargo Letter states:

> We have some difficult news to share. When you were considered for a loan modification, you weren't approved, and now we realize that you should have been. We based our decision on a faulty calculation, and we're sorry. **If it had been correct, you would have been approved for a trial modification.**
>
> **We want to make things right.**

*Id.* (emphasis added).

66.     Through the Wells Fargo Letter, Wells Fargo provided the Wests with a check in the amount of Fifteen Thousand Dollars ($15,000.00).

67.    The Wells Fargo Letter states that if the Wests feels that Wells Fargo has not "made things right" the Wests could submit to mediation which in the Wells Fargo letter Wells Fargo did not clarify (1) whether the mediation would be binding; (2) when the mediation would take place; and, (3) how the mediation would take place. *Id.*

68.    As Wells Fargo failed to "make things right", the Wests retained Craig Henry PLC and DannLaw to file the current matter against Wells Fargo for violations of the CFA, the covenant of good faith and fair dealing, and common law fraud based upon the wrongful denial of the loss mitigation application and concealment of the calculation error for nearly three (3) years, all to the Wests' great prejudice and damage.

69.    Wells Fargo's conduct directly and proximately caused the following damages to the Wests:

  A. Wells Fargo took away the opportunity for the Wests to obtain a permanent loan modification and remain in their home at a time when the Wests met all eligibility requirements for a loan modification based on Wells Fargo's actions in approving the Wests for a Loan Modification in January 2011 (Mod 1) and all of the same financial circumstances existed with Mod 2;

  B. Wells Fargo took away the opportunity for the Wests to obtain a permanent loan modification and remain in their home by wrongfully denying Mod 2 as the Wests had sufficient income during periods of time in 2013 and 2014 prior to the Master Commissioner Sale to be eligible for a Loan Modification;

  C. Their property has increased in value up to $353,000 since the Master Commissioner Sale in April 2014. Wells Fargo took away the opportunity for the Wests to realize this equity of over $170,000.00 based upon the total debt payoff that the Wests owed Wells Fargo as of the time of the Order Distributing Sale Proceeds; a copy of the Zillow valuation is attached as Exhibit 14;

  D. The Wests had to retain legal counsel to file this complaint which would have never been needed had Wells Fargo correctly offered the Wests a trial modification;

  E. The Wests suffered extreme emotional distress, resulting from:

a.  The unproductive and repetitive loss mitigation process;

b.  The wrongful denial of their mitigation applications due to the "faulty calculation" error;

c.  The continuance of the foreclosure before and after the "faulty calculation" error;

d.  The loss of their home; and,

e.  Unnecessary, excessive stress resulting in the Wests' separation.

F.  The Wests hoped and believed that by entering into a trial modification and a permanent modification of the Loan that they would be able to immediately begin the long process of improving their credit standing.

a.  Wells Fargo reported the Wests to the Credit Reporting Agencies as delinquent on the loan leaving them unable to obtain credit or insurance at reasonable rates.

b.  Some of the Wests' credit cards were canceled or the available limits were lowered.

c.  Although Wells Fargo stated it would reach out to the Credit Reporting Agencies to remove any negative reporting, it waited years to correct the damage (even apparently after it knew it had made a mistake by not approving her for a trial modification).

**d.  Tolling allegations for all counts.**

70.  The causes of actions alleged herein by the Wests against Wells Fargo did not accrue or were tolled until they discovered, or could have discovered with exercise of reasonable diligence, facts giving rise to their legal claims. Based upon the allegations contained herein and Exhibit 13, the earliest the Wests were made aware of the possibility of these claims was on or about September 11, 2018 when Mr. West and Ms. West received the letter from Wells Fargo.

71.  Based upon the allegations contained herein the Plaintiffs had no realistic possibility until receiving the September 11, 2018 letter to know that: (a) They qualified for the mortgage modifications in 2012 and/or 2013 prior to the home being sold by the Master

Commissioner; and (b) they were denied wrongfully for a mortgage modification based on a miscalculation done by Wells Fargo's automated decision-making tool that was exclusively under the control of Wells Fargo at all times (as it remains).

72.    Based upon the allegations contained herein the Wests had no realistic ability to discover any facts only known to Wells Fargo regarding the wrongful denial for the mortgage modifications submitted by the Wests in 2012 and 2013. Wells Fargo's automated decision-making tool is not public, and the mathematical calculations used to determine eligibility for any mortgage modification depend solely on variables within Wells Fargo's exclusive control or information provided exclusively to Wells Fargo.

73.    Based upon the actions of Plaintiff Stanford West and Defendant Wells Fargo in *Stanford West v. Wells Fargo Bank, N.A.*, Fayette County Circuit Court Case No. 18-CI-03929 and *Stanford West v. Wells Fargo Bank, N.A.*, Fayette County Circuit Court Case No. 19-CI-00164 as well as the actions of Plaintiff James D. Lyon as Trustee and Defendant Wells Fargo Bank, N.A. in Melissa Wests' Bankruptcy Case which led the Stipulation and Protective Order attached as Exhibit 15.  The earliest the Plaintiffs received any substantive information regarding their claims was April 26, 2019 when Wells Fargo produced, by agreement, agreed-upon items of the servicing file of the Loan.

74.    Based on the foregoing, any applicable statutes of limitations are also tolled by Wells Fargo's knowing, active, and ongoing concealment of the facts alleged herein. Wells Fargo discovered at least one, if not multiple, software errors back in October 2015 which contributed to the wrongful denial of Mr. and Mrs. Wests' loan modifications. Based on the allegations contained herein and Exhibits 11, 12 and 13, Wells Fargo deliberately concealed any information regarding the wrongful denial until September 11, 2018. Wells Fargo has a

continuous duty to disclose the truth to the Plaintiffs and based upon the actions herein the Plaintiffs reasonably relied on Wells Fargo's on-going concealment until taking the actions to procure discovery described herein.

## COUNT ONE:
## COMMON LAW FRAUD

75.     The Wests restate and incorporate all of their statements and allegations contained in this Complaint, in their entirety, as if fully rewritten herein.

76.     Wells Fargo made material misrepresentations of a material fact when it misrepresented to the Wests in 2012 and 2013 that they did not qualify for a loan modification.

77.     Wells Fargo was aware of this faulty calculation since at least October 20, 2015 yet continued to conceal this error from the Wests until discretely disclosing this information in their August 3, 2018 10-Q and amending the disclosure in the 10-Q forms filed in October 2018, January 2019 and April 2019 respectively.  *See also* Exhibits 11 and 12.

78.     Wells Fargo continues to conceal the details surrounding the "faulty calculation" error and refuses to provide The Wests with more information relating to her loss mitigation denial and how Wells Fargo discovered and corrected the error.

79.     Wells Fargo knew or should have known that the misrepresentations were false, as inferred by its inexplicable conduct in failing to notify the Wests, and other borrowers who lost their homes, of the "faulty calculation" for nearly three years after the error was corrected.

80.     Wells Fargo intended that the Wests rely on the misrepresentations in order to continue with the Foreclosure Case and avoid potential legal claims.

81.     The Wests reasonably relied on the misrepresentations because there was no possible way to discover that she was wrongfully denied until Wells Fargo informed them five years later of the "faulty calculation".

82.     The Wests suffered actual damages, as plead, *supra*, at ¶ 69, that were caused by Wells Fargo's conduct.

83.     The damages to the Wests were foreseeable because Wells Fargo knew they would lose their home after Wells Fargo improperly denied them a loan modification. Wells Fargo was simultaneously pursuing a foreclosure and reviewing the Wests' eligibility for a loan modification.

84.     As Wells Fargo's conduct was willfully and wantonly reckless or malicious, the Wests are entitled to an award of actual damages in an amount to be determined but at least $170,000.00 and punitive damages.

## COUNT TWO:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

85.     The Wests restate and incorporate all of their statements and allegations contained in this Complaint, in their entirety, as if fully rewritten herein.

86.     Wells Fargo engaged in extreme and outrageous conduct as alleged herein. Wells Fargo repeatedly failed to properly verify or audit mortgage modification software on which its customers' homes and wellbeing depended. It allowed systemic errors to persist for five to eight years; ignored consent decrees requiring it to reform its mortgage modification and foreclosure practices; failed to reform its verification and auditing practices even after the government found a software error had led the Bank to wrongfully deny mortgage modifications; concealed its discovery of an additional software error from regulators and customers; and failed to identify other related errors for an additional three years.

87.     The same extreme and outrageous conduct that caused a series of scandals and consumer abuses within Wells Fargo—leading the government to impose billions of dollars in fines and to forbid Wells Fargo from growing until reforms were implemented—was also

responsible for the Wests losing their home here. Wells Fargo's Board and executive leadership abandoned their oversight responsibilities to a shocking degree, repeatedly ignoring compliance failures, government fines, and consent decrees requiring leadership to implement appropriate auditing and compliance procedures.

88.    With regard to the Bank's mortgage modification and foreclosure processes in particular, Wells Fargo's Board and executive leadership repeatedly failed to ensure the Bank conducted the necessary testing and audits to detect and promptly remedy any violations of HAMP or other government requirements. Wells Fargo's leadership ignored its oversight responsibilities even after the government found it had not adequately overseen the Bank's mortgage modification and foreclosure operations, even after it agreed to implement proper oversight as part of two 2011 consent orders, and even after the government found in 2015 that Wells Fargo had continuously failed to comply with the consent. Leadership so flagrantly and repeatedly disregarded its oversight responsibilities that the Federal Reserve imposed an asset-restriction on Wells Fargo, under which it will be prohibited from growing unless and until it reforms its oversight and governance.

89.    Wells Fargo acted with reckless disregard for the probability that its conduct would cause emotional distress to The Wests who was wrongfully denied mortgage modifications and foreclosed upon.

90.    As a direct and proximate result of Wells Fargo's conduct, The Wests has suffered both monetary losses and emotional distress as plead, *supra*, at ¶ 69.

91.    The Wests' emotional distress was so severe that no reasonable person could be expected to endure it.

21

92.     The damage to the Wests was foreseeable because Wells Fargo knew the Wests would lose their home after Wells Fargo improperly denied them a loan modification. Wells Fargo was simultaneously pursuing a foreclosure and reviewing the Wests' eligibility for a loan modification.

93.     As Wells Fargo's conduct was willfully and wantonly reckless or malicious, the Wests are entitled to an award of actual damages in an amount to be determined but at least $170,000.00 and punitive damages.

**COUNT THREE:**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

94.     The Wests restate and incorporate all of their statements and allegations contained in this Complaint, in their entirety, as if fully rewritten herein.

95.     Wells Fargo owed a duty to exercise reasonable care in evaluating the Wests' eligibility for a loan modification because Wells Fargo undertook to review the Wests' mortgage loan for a loan modification.

96.     Wells Fargo breached that duty by negligently misrepresenting that the Wests did not qualify for a trial modification and continuing the foreclosure process.

97.     As a direct and proximate cause of Wells Fargo's breach, the Wests have suffered monetary losses and emotional distress that resulted in substantial bodily injury or sickness, as pleaded, *supra*.

98.     The damage to the Wests was foreseeable because Wells Fargo knew they would lose her home after Wells Fargo improperly denied them a loan modification. Wells Fargo was simultaneously pursuing a foreclosure and reviewing the Wests' eligibility for a loan modification.

99.     As a result of Wells Fargo's conduct described herein the Wests are entitled to an award of actual damages in an amount to be determined but at least $170,000.00 and punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE,** the Wests request that this Court enter its order granting judgment against Defendant Wells Fargo Bank, N.A. for the following:

A.     An award of Actual damages per Plaintiff of at least $170,000.00 and in an amount to be determined at trial against Wells Fargo for the allegations contained in Count One, Count Two and/or Count Three;

B.     For an award of punitive damages per Plaintiff in an amount to be determined at trial against Wells Fargo for the allegations contained in Count One, Count Two and/or Count Three;

C.     For an award of Prejudgment and post-judgment interest on all of these amounts at the maximum rate allowed by law;

D.     Trial by jury; and,

E.     Any and all other relief to which this Court may deem them entitled.

Respectfully submitted,

DANNLAW
Brian D. Flick, Esq. #0095244

*/s/ Brian D. Flick, Esq.*
PO Box 6031040
Cleveland, Ohio 44103
Telephone: (216) 373-0539
Facsimile: (216) 373-0536
bflick@dannlaw.com
notices@dannlaw.com

CRAIG HENRY PLC
James Craig

/s/ James Craig
239 South Fifth Street, Suite 1400
Louisville, Kentucky 40202

23

Telephone: (502) 614-5962
Facsimile: (502) 614-5968
jcraig@craighenrylaw.com

*Counsel for Plaintiffs' Stanford West and Plaintiff James D. Lyon as Trustee for Estate of Melissa Monday-West*